UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FLOYD CULHANE,                    :            CIVIL ACTION NO.
                                  :
                  Plaintiff,      :
                                  :            3:11-CV-1799 (HBF)
        vs.                       :
                                  :
                                  :
JANICE CULHANE.                   :
                                  :
                  Defendant.      :
                                  :

BENCH RULING

        Plaintiff Floyd Culhane filed this diversity action on

November 18, 2011, against defendant Janice Culhane. It arises

from a long-drawn and bitter dispute between brother and sister

over a residential property inherited from their deceased

mother.  Plaintiff seeks a statutory accounting and distribution

pursuant to Conn. Gen. Stat. §52-404(b), and alleges unjust

enrichment, and breach of fiduciary responsibility by defendant.

Plaintiff also seeks compensatory damages.

        Defendant asserts two counterclaims, for statutory

accounting and distribution pursuant to Conn. Gen. Stat. §52-

404(b) and for unjust enrichment.

        A court trial was held on February 5 and 6, 2013, during

which the following witnesses testified: Floyd Culhane; Janice

Culhane; attorney Steven Colarassi; and Susan Arnold.  All

exhibits were entered pursuant to agreement.  At the conclusion

of plaintiff's case, the defendant moved for a "directed verdict" to strike allegations of damages which the defendant believed to be speculative in nature and/or not supported by evidence presented by plaintiff, such as rent owed by defendant to the co-owner plaintiff, and any damages caused by defendant's alleged neglect of the property.  The Court reserved ruling on defendant's motion.[1] The testimony and evidence adduced at the trial are summarized below as necessary to explain the Court's findings and conclusions.

**I.    <u>Findings of Fact</u>**[2]

  **A. The Property**

   1.   At issue is a residential property located at 16 High Street in Bethel, Connecticut (the "property" or the "home"),

---

[1] The Court construes defendant's motion as a motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c), "which allows the court to enter judgment as a matter of law in the moving party's favor at any point in the proceedings when the non-moving party has been fully heard on an issue during a non-jury trial and the court finds against the party." <u>Fabricated Wall Sys., Inc. v. Herman Miller, Inc.</u>, No. 3:08-cv-01313 (SRU), 2011 WL 5374130, at *1 (D. Conn. Nov. 8, 2011) (citing Fed. R. Civ. P. 52(c); <u>AmBase Corp. v. SDG Inc.</u>, No. 3:00CV1694(DJS), 2005 WL 1860260, at *2 (D. Conn. Aug. 3, 2005)).  "A Rule 52(c) motion made by a defendant may be granted where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim."  <u>Fabricated Wall Sys.</u>, 2011 WL 5374130, at *1 (citation and internal quotations omitted.  Defendant's motion [Doc. #57] is **DENIED AS MOOT**, in light of the Court's ruling set forth below.
[2] For jurisdictional purposes, the Court finds that plaintiff is a citizen of Maryland and Massachusetts, and that defendant is a citizen of Connecticut. The Court, moreover, finds that the amount in controversy exceeds $75,000.

-2-

which was previously owned by the parties' mother, Edith Culhane. [Def. Exs. 549, 549A, 550, 550A, 551, 551A].

2.  In 1982, Edith Culhane equally devised her interest in the property among herself and her three children: plaintiff, defendant, and Michael C. Culhane. [Def. Exs. 549, 549A].

3.  In 1996, Michael C. Culhane devised his interest in the property to plaintiff. [Def. Exs. 550, 550A].

4.  On November 10, 1999, Edith Culhane quitclaimed her interest in the property to defendant, making the parties fifty percent co-owners. [Def. Exs. 551, 551A].

5.  The property consists of a single-family home, with an attached one-bedroom rental apartment (the "apartment"). [Def. Ex. 514].  The home was built in 1900 and has 2,970 square feet of living area. [Def. Ex. 537Z35].

6.  The parties' mother died in March 2000. [Jt. Pre-Trial Mem., Doc. #45, at 13].  Prior thereto, defendant acted as a live-in caretaker for her mother from approximately February 1999 until October 1999, when Edith Culhane entered a nursing home.  During this time, Edith Culhane required twenty-four hour care, which defendant provided while residing in the home with her mother.[3]

---

[3] Defendant also resided in the home prior to 1999.  However, at the pretrial conference on January 29, 2013, the parties agreed to limit their claims to February 1999 through June 2010.

-3-

7.   The parties are brother and sister, but have been estranged since their mother's death.  The atmosphere between the parties since this time has been acrimonious and rife with dispute.

8.   Defendant resided in the home exclusively from approximately 1999 through January 2007.  Defendant did not pay plaintiff rent for her use of the home during this time.

9.   Plaintiff testified on cross-examination that he expected to receive rent for defendant's use of the property. Plaintiff did not raise this issue with defendant, or the issue of rent from the apartment, until July 2005. [See also Pl. Ex. 6].

10.  Plaintiff did not reside in the home at any point from 1999 to 2010.

11.  Plaintiff testified that he did not visit the property until April 2008.

12.  During the time period at issue, defendant rented the apartment for one year beginning on April 1, 2002, at a rate of $1,150 per month, for a total of $13,800 annually. [Def. Ex. 544].  Defendant did not share these rental proceeds with plaintiff, but testified that she applied these proceeds to delinquent property taxes.

13.  Plaintiff admitted at trial that he did not make any attempts to rent the apartment.

-4-

14. The Court credits defendant's testimony that she attempted to rent the apartment at other times without success.

15. The Court further credits defendant's testimony that after she vacated the property, she did not attempt to rent the main house because it did not have heat, as a result of her "winterizing" the home.

16. Both plaintiff and defendant testified at length regarding the condition of the property. Pictures taken by realtor Jay Streaman depict the home in a general condition of disrepair. [Pl. Ex. 2]. However, the Court credits defendant's testimony that these pictures do not fairly and accurately represent the overall condition of the home. Indeed, pictures in a real estate advertisement depict the home in better condition, which defendant testified is a fair and accurate depiction of the home in early May 2007. [See Def. Ex. 514, 514A]. The Court further credits defendant's testimony that damage depicted in plaintiff's exhibit 2 either existed at the time the parties inherited the property and/or occurred as a result of winterizing the home. The Court gives more weight to defendant's testimony, given that she continuously lived at the home from 2000 through 2007, and because plaintiff testified he did not inspect the property until April 2008.

17. Testimony of an uninvolved witness, Susan Arnold, lends further credence to defendant's testimony concerning the

-5-

condition of the home.  Ms. Arnold, who lives next door to the property and has known defendant since 1949, testified that she visited the home in early 2007 and that the home resembled the pictures in defendant's exhibits 14 and 14A.  Ms. Arnold further testified that defendant maintained the home, and was working room by room to repair or rehabilitate the home to its former condition.

**B. 1999 Mortgage**

18.  In February 1999, the parties obtained a $70,000 mortgage for the purposes of making repairs to the home, including replacing the roof (the "1999 loan").

19.  The proceeds from the 1999 loan were placed in a joint account held by the parties.  Defendant drew on this account to make repairs to the property. The Court credits plaintiff's testimony that he did not receive any disbursements from, or personal use of, the 1999 loan proceeds.

20.  Defendant testified that she applied the 1999 loan proceeds to property repairs, and that the loan proceeds were exhausted by 2000.

21.  Defendant paid the monthly mortgage payments on the 1999 loan from April 2, 1999 through February 13, 2004, in the amount of $648.65 per month. [Def. Exs. 542, 542A-N].  Plaintiff did not contribute to the mortgage payments during this time.

**C. 2004 Mortgage**

22.   In February 2004, the parties refinanced the property
with GMAC Mortgage, LLC in the amount of $110,000 to take
advantage of lower interest rates (the "2004 loan"). [Pl. Ex.
24].

23.   Plaintiff executed the mortgage instrument, but
testified that he did not execute the related promissory note.
[Id.].[4]

24.   The proceeds of the 2004 loan were distributed as
follows: $56,000 to Chase Bank to satisfy the 1999 loan;
$14,239.52 to the Town of Bethel for property taxes; $2,000 to
Sears to satisfy a lien for financed kitchen cabinets; and
$22,481.33 to pay off defendant's car loan. [See Def. Ex. 556].

25.   After deducting the settlement costs and disbursements
to third parties, $14,477.31 was disbursed directly to defendant
from the 2004 loan proceeds. [Id.]   The Court credits
plaintiff's testimony that he did not receive any disbursements
from, or personal use of, the 2004 loan proceeds.

26.   The parties agreed that defendant would make the
monthly mortgage payments on the 2004 loan.

27.   Defendant made the monthly mortgage payments on the
2004 loan from March 2004 through June 2008, in the amount of

---

[4] Plaintiff's exhibits 4 and 5 are partial copies of the 2004
promissory note, and do not have a signature page.  However, the first
page of each exhibit reflects defendant's initials, "JHC".  [See Pl.
Exs. 4-5].

-7-

$650.70 per month. [See Def. Exs. 539, 539A-D; 543, 543A-C; Pl. Ex. 10]. Defendant testified that she ceased making these mortgage payments due to her inability to pay. Defendant did not advise plaintiff that she had ceased paying the 2004 loan.

28. The parties understood that defendant would eventually repay the 2004 loan in its entirety. The Court further credits defendant's testimony that she applied part of the 2004 loan proceeds to repay her car loan because it was her understanding that she would eventually acquire plaintiff's share of the property.[5]

**D. Foreclosure Actions and Reinstatement of the 2004 Loan**

29. On or about July 2008, the parties defaulted on the 2004 loan as a result of non-payment. [See Pl. Ex. 10].

30. On October 10, 2008, GMAC Mortgage sued the parties in Connecticut Superior Court to foreclose the 2004 mortgage. [Def. Exs. 552, 552A-L].

31. In November 2008, plaintiff reinstated the 2004 loan by making payment to GMAC Mortgage in the amount of $6,123.42, for past-due payments, interest, attorney's fees, and other incurred costs. [Pl. Ex. 10].

---

[5] The parties testified as to some discussions regarding the disposal of the property prior to its sale. Plaintiff offered his living rights in the property to defendant, with the remainder to plaintiff's daughter, while defendant presented an offer to plaintiff to buy out his share of the property. The parties failed to reach any agreement.

32.   On or about March 2009, the bank sued to foreclose the property a second time.   Plaintiff testified that he stopped paying the 2004 loan on the basis that defendant solely executed the promissory note.   Plaintiff hired Attorney Jerome Mayer to defend against the second foreclosure action on this basis, and paid his attorney's fees.   Defendant did not contribute towards Attorney Mayer's fees.

33.   Plaintiff testified that Attorney Mayer successfully defended against the second foreclosure action, and reached a settlement with GMAC Mortgage wherein the 2004 Loan was, inter alia, reinstated without penalties. [See Def. Ex. 515].

**E. Sale of the Property**

34.   Sometime in May 2007, the parties listed the property for sale with a realtor, Mary Nagle, at $485,000. [See Def. Exs. 506, 506A-D, 514].   The property did not sell during Ms. Nagle's listing period.

35.   On August 1, 2007, a prospective buyer offered to purchase the property for $405,000, but this offer fell through. [Def. Ex. 527, 527A-D].   Sometime thereafter, a second prospective buyer offered to purchase the property for "$440,000", but this deal likewise did not close.

36.   In November 2007, the parties listed the property with a new realtor, Jay Streaman, at the offering price of $439,900. [Def. Ex. 526A].

-9-

37.   Sometime in 2008, the parties removed the property from the market for thirty (30) days to repair damage to the home.

38.   On June 29, 2010, the property ultimately sold for $337,500. [Pl. Ex. 14].

39.   The proceeds of the sale were distributed as follows: $110,617.29 to satisfy the 2004 loan; $16,875 in brokers' commission fees; $2,531.25 in conveyance tax; $90 to the title insurance company; and $1,030 to the parties' attorney. [Pl. Ex. 14].

40.   The remaining $206,287.84 in sale proceeds has yet to be disbursed from escrow as a result of the parties' failure to agree on its allocation. [Id.].

**F. The Parties' Expenses**

***Uncontested Expenses***

41.   Defendant does not contest the following expenses incurred by plaintiff in connection with the property:

> a.  $6,124.42 paid to reinstate the 2004 Loan. [Pl. Ex. 10; Def. Post-Evid. Trial Mem., Doc. #65, at 8];
>
> b. $14,150.00 paid to DeMarco Construction to make repairs to the home in anticipation of its sale. [Pl. Ex. 11; Def. Post-Evid. Trial Mem., Doc. #65, at 8];

c. $15,000 paid to DeMarco Construction to make repairs to the home in anticipation of its sale. [Pl. Ex. 11; Def. Post-Evid. Trial Mem., Doc. #65, at 8];

d. $21,857.43 total paid for real property taxes ($20,291.08) and public utility charges ($1,566.33). [Pl. Ex. 15; Def. Post-Evid. Trial Mem., Doc. #65, at 8];

e. $28,438.04[6] paid to Handyman Connection to make the home saleable. [Pl. Ex. 16; Def. Post-Evid. Trial Mem., Doc. #65, at 8]; and

f. $6,591.19[7] paid to "other contractors" to make the home saleable. [Pl. Ex. 15; Def. Post-Evid. Trial Mem., Doc. #65, at 8].

---

[6] Although defendant agrees to the amount of $28,438.04 paid to Handyman Connection, the Court finds defendant's calculations flawed. Although defendant is correct that plaintiff duplicates the charges to Handyman Connection in his exhibits 15 and 16, a review of these bills indicates that the correct amount paid to Handyman Connection is $32,833.04.  This total reflects the addition of $5,000 paid to Handyman Connection on September 24, 2010, and the subtraction of $605, which was a payment to an insurance company.  **Accordingly, the Court finds that plaintiff paid $32,833.04 to Handyman Connection for the purpose of preparing the home for sale**. [See Pl. Exs. 15-16; Def. Post-Evid. Trial Mem., Doc. #65, at Chart One].

[7] The Court has carefully reviewed plaintiff's exhibits in support of his claims for payments made to repair the home in anticipation of its sale.  After such review, **the Court finds that the plaintiff paid $6,240.06 to "other contractors" and not $6,591.19, as alleged by defendant**.  Because defendant fails to explain how it arrived at this number, the Court cannot explain why these calculations differ.

*Plaintiff's Expenses*

42.  On December 20, 1999, plaintiff paid $120 for garbage disposal. [See Pl. Ex. 25].

43.  On July 26, 1999, plaintiff paid $130.35 for Orkin to provide termite treatment to the property. [See id.].

44.  Plaintiff paid for general upkeep and repair of the property from sometime in 2008 until the property was sold in 2010.[8]

45.  On September 2, 2008, plaintiff paid $61.99 to Gulf Oil for home heating oil. [Pl. Ex. 15].

46.  On April 21, 2009, plaintiff paid $38.79 to Connecticut Light and Power for the property's electric bill. [Pl. Ex. 15].

47.  From approximately March 2009 through May 2010, plaintiff paid $6,882.87 in homeowner's insurance premiums. [Pl. Ex. 15].

48.  Plaintiff paid Attorney Jerome Mayer $5,493 to defend against the second foreclosure action. [Pl. Ex. 18].

---

[8] See, e.g., paragraphs 41a-f, supra.

**Defendant's expenses**[9]

49.  Defendant generally paid the property taxes and household expenses from 2000 through 2007, until she could no longer afford to do so.

50.  From 2000 through 2007, defendant paid $43,831 in property taxes for the home. [Def. Exs. 532, 532A-G; 540],[10] of which $14,239.52 was paid from the 2004 Loan Proceeds. [Def. Ex. 556]. Accordingly, the Court finds that defendant paid a net total of $25,591.48 on property taxes for the home.

51.  From 2000 through 2008, defendant paid $9,961 total for property insurance premiums. [Def. Exs. 541, 541A-H].[11]

52.  In 1999, defendant incurred $55,511.35 in expenses related to the property. See Appendix A.

53.  In 2000, defendant incurred $10,494.62 in expenses related to the property. See Appendix B.

_____

[9] Defendant submitted a post-evidence trial memorandum in support of her claims. (Doc. #65).  Defendant's exhibits are rife with duplicate entries for the same expenses.  Although defendant attempted to direct the Court's attention to items that should be "deleted" or ignored, the Court's review of defendant's Schedule One still reveals a multitude of errors.  The Court has carefully reviewed defendant's claimed expenses in Schedule One to ensure that none are double counted.  It troubles the Court that neither defendant, nor the plaintiff, took note of, or issue with, such duplicate claimed expenses.

[10] Plaintiff's proposed findings of fact state that, "[defendant] is due credits for real estate taxes she paid from 2000 to 2007 totaling $43,831[. . .]" [Pl. Prop. Findings of Fact, Doc. #53, at ¶38].

[11] Plaintiff's proposed findings of fact state that, "[defendant] is due credits for… house insurance she paid from 2000 to 2007 totaling $9,961[. . .]" [Id.].

54.   The Court credits defendant's testimony that she personally painted and wallpapered the interior of the home in 2000 or 2001. See also Def. Ex. 537Z34.

55.   In 2001, defendant paid $4,954.40 toward the property's expenses. See Appendix C.

56.   In 2002, defendant paid $3,582.64 toward the property's expenses. See Appendix D.

57.   In 2003, defendant paid $11,309.15 toward the property's expenses. See Appendix E.

58.   In 2004, defendant paid $4,295.24 toward the property's expenses. See Appendix F.

59.   In 2005, defendant paid $4,013.90 toward the property's expenses. See Appendix G.

60.   In 2006, defendant paid $1,589.75 toward the property's expenses. See Appendix H.

61.   After vacating the home, defendant paid $9,353.48 toward the property's expenses. See Appendix I.

## II.  Conclusions of Law

### A. Jurisdiction and Choice of Law

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the matter in controversy exceeds $75,000.

2.    Because the Court sits in diversity, the substantive law of the forum state, here Connecticut, applies.  Stephens v. Norwalk Hosp., 162 F. Supp. 2d 36, 39 (D. Conn. 2001) (noting the "undisputed principle that a federal court sitting in diversity applies the substantive law of the forum state.").

**B. Plaintiff's Claims**

***Count One – Action for Accounting and Distribution***

3.    Plaintiff seeks an accounting pursuant to Conn. Gen. Stat. §52-404(b) and distribution of the property's sale proceeds.

4.    Section 52-404(b) provides that,

> When two or more persons hold property as joint tenants [. . .], if one of them occupies, receives, uses or takes benefit of the property in greater proportion than the amount of his interest in the property, any other party and his executors or administrators may bring an action for accounting or for use and occupation against such person and recover such sum or value as is in excess of his proportion.

Conn. Gen. Stat. §52-404(b).

5.    Section 52-404(b) incorporates the "complete array of equitable principles."  See Lerman v. Levine, 14 Conn. App. 402, 410-13 (App. Ct. 1988) (Borden, J., concurring and dissenting); see also Crowell v. Danforth, 222 Conn. 150, 163 (1992) (Borden, J., dissenting in part).

6.   "A cotenant's 'due proportion' under General Statutes § 52-404(b) 'cannot be determined without a consideration of all the equities between the parties, arising out of the dealings with respect to the land in question.  Of critical importance in considering those equities is whether there was an intent or understanding between the cotenants that a payment or contribution would be due." Crowell, 222 Conn. at 163 (Borden, J., dissenting in part) (quoting Lerman, 14 Conn. App. at 411-12).

7.   "It is not always true that each tenant in common or joint tenant is entitled to equal shares in real estate. . . The trial court may distribute the proceeds of the sale in accordance with the equitable interest of each party." DiCerto v. Jones, 108 Conn. App. 184, 190 (App. Ct. 2008) (quoting Fernandes v. Rodriguez, 90 Conn. App. 601, 610 (App. Ct. 2005)); but see Nelson v. Catalano, No. CV030824431, 2007 WL 2081205, at *2 (Conn. Super. Ct. April 3, 2007) (quoting Am. Jur. 2d, Co-Tenancy and Joint Ownership, § 58) ("[W]hen one co-tenant has paid a debt or obligation for the benefit of the common property, he is entitled as a matter of right to have his co-tenants refund to him their proportionate shares of the amounts paid.").

8.   Plaintiff carries the burden of proof with regard to the amount of damages to be awarded.  Plaintiff has the burden

-16-

of proving damages to a reasonable certainty.  Leisure Resort

Tech., Inc. v. Trading Cove Assoc., 277 Conn. 21, 35 (2006).

9.   As a general matter, the Court declines to award

credit for duplicate expenses, expenses incurred prior to

February 1999, and expenses that are not properly supported by

either the plaintiff's credible testimony or documentary

evidence. Bearing these principles in mind, the Court makes the

following conclusions as to plaintiff's credits, and defendant's

reductions, from the escrowed sale proceeds.[12]

10.   Absent defendant's objection, the Court finds that

plaintiff is entitled to the following credits, and defendant,

the following reductions:

| Purpose | Credit to Plaintiff | Reduction from Defendant |
|---|---|---|
| 2004 Loan Reinstatement | $3,062.21 | ($3,062.21) |
| DeMarco Construction | $14,575 | ($14,575) |
| Real Property Taxes | $10,145.54 | ($10,145.54) |
| Public Utility Charges | $783.17 | ($783.17) |
| Handyman Connection | $16,416.52 | ($16,416.52) |
| Other Contractors | $3,120.03 | ($3,120.03) |
| **UNCONTESTED TOTAL:** | $48,102.47 | ($48,102.47) |

11.   The Court further finds that plaintiff is entitled to

the following credits for amounts paid in connection with the

property, and defendant the following reductions:

---

[12] This section will only address the accounting sought by plaintiff.

| Purpose | Credit to Plaintiff | Reduction from Defendant | | |
|---|---|---|---|---|
| Garbage Disposal | $60 | ($60) | | |
| Orkin | $65.18 | ($65.18) | | |
| Gulf Oil | $30.99 | ($30.99) | | |
| CT Light and Power | $19.39 | ($19.39) | | |
| Property Insurance | $3,441.43 | ($3,441.43) | | |
| **TOTAL:** | $3,617 | ($3,617) | | |

12. Plaintiff seeks credit for half of the $5,493 in attorney's fees he incurred defending the property against the second foreclosure. Although defendant admits that the defense of the foreclosure "collaterally benefitted" her, she argues that plaintiff should not be entitled to a credit because plaintiff "could have made the [monthly mortgage] payments [. . .] but instead consciously chose not to make the monthly payments." [Def. Post-Evid. Trial Memo., Doc. #65, at IIIA]. The Court finds defendant's argument unavailing. The issue of whether plaintiff could have paid the mortgage is irrelevant to whether he is entitled to a credit for defending the property against a second foreclosure. Because plaintiff incurred this expense for the benefit of both parties, i.e., preventing the loss of the property, equity dictates that plaintiff receive credit for half of the attorney's fees expended in defending the foreclosure. See Nelson, 2007 WL 2081205, at *3 (noting that "[t]he Appellate Court has recently affirmed the award of attorney['] fees on equitable grounds."). Moreover, defendant does not take issue with the reasonableness of the amount of

attorney's fees plaintiff incurred.  Accordingly, the Court
awards plaintiff credit in the amount of $2,746.50, and reduces
defendant's account by the same figure.

13.  Plaintiff claims a $151 credit for a motel bill he
incurred while attending his mother's funeral in Connecticut.
Plaintiff testified that defendant refused to allow plaintiff
and his family to stay at the home during the funeral.  Although
co-tenants are entitled to equal use of the property, based on
equitable principles discussed above, the Court declines to
award plaintiff credit for this item.  See DiCerto, 108 Conn.
App. at 190  (quoting Fernandes, 90 Conn. App. at 610)

14.  Plaintiff seeks credit for half of $1,475 allegedly
incurred for "yard cleanup".  The Court declines to award this
credit, as plaintiff has failed to meet his burden of proving
this expense.  Indeed, other than plaintiff's self-created chart
listing this expense [Pl. Ex. 23], there is no competent
evidence to support the award of this cost. See Leisure Resort,
277 Conn. at 35.

15.  Plaintiff next seeks credit for half the amount of the
property's alleged market loss.  Plaintiff claims the property
was valued at $600,000 before the housing decline in 2006.  He
seeks half of $120,000, which plaintiff claims is the difference
between his alleged market value ($600,000), and the initial
listing price of the property ($480,000).  [Pl. Post Trial

-19-

Summ., Doc. #66, at K].  The Court declines to credit plaintiff for this item.  Plaintiff has failed to present any evidence of the property's value in 2006, except for his own testimony. Plaintiff is not a property appraiser, nor an expert on property values.  Accordingly, the Court does not credit plaintiff's testimony, and finds that he has failed to sustain his burden to prove this damage.  Although damages may be based on reasonable and probable estimates, the Court may not award damages on the basis of guess, speculation or conjecture.  See Leisure Resort, 277 Conn. at 35.

16.  Plaintiff also seeks credit for attorneys' fees he has incurred as a result of "recreational litigation" threatened by defendant for partition of the property.  Plaintiff additionally seeks credit for attorneys' fees incurred in this action.  [See Pl. Ex. 23].  As is well established in Connecticut, "attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception..."  Comm'r of Envir. Protection v. Mellon, 286 Conn. 687, 695 (2008).  Plaintiff has failed to point to any contractual provision or statutory exception that would here permit the award of attorneys' fees.  Accordingly, the Court declines to credit plaintiff for these items.

17.  Plaintiff next seeks credit for half of the $13,800 collected by defendant from the rental of the apartment.

Although defendant failed to remit half of the collected rent to plaintiff, the Court credits defendant's testimony that the rental proceeds were applied to delinquent property taxes. Accordingly, because the rental proceeds jointly benefitted the parties, and based on equitable principles discussed above, the Court declines to award plaintiff credit for one half of the rental proceeds.

18.   Plaintiff also seeks credit for half of the uncollected rent as a result of the apartment sitting vacant for seventy two (72) months. Plaintiff alleges a rental value of $1,150 per month for a total of $82,800 in uncollected rent. The Court declines to award plaintiff this credit for several reasons.   First, although plaintiff resided out of state during the time in question, he made absolutely no efforts to rent the apartment.   Although defendant and plaintiff were estranged, and defendant controlled the heat to the apartment, the plaintiff cannot now complain of a vacant apartment that he made no efforts to rent.   Additionally, plaintiff claims a monthly rental rate of $1,150.   Ostensibly, plaintiff obtains this value from the apartment's 2002 lease.   The Court is not satisfied that the rental rate for the apartment remained consistent from the year 2000 through the year 2010.   Plaintiff has failed to present any other evidence of the rental value of the apartment, and therefore has not sustained his burden of proving this

damage.  See Leisure Resort, 277 Conn. at 35.  Finally, the
Court credits defendant's testimony that she attempted, without
success, to rent the apartment.  It goes against equity to
reward plaintiff for making no efforts to rent the apartment,
and punish defendant for attempting to rent the apartment
without success.  Accordingly, the Court declines to award
plaintiff uncollected rent for the apartment.

19.  Plaintiff next seeks credit for defendant's use and
occupancy of the home from 2000 through 2006.  Plaintiff seeks
payment of $1,150 per month for eighty four (84) months.  The
Court also declines to award plaintiff this sum.  As an initial
matter, plaintiff failed to present any evidence of the main
home's rental value, and accordingly has failed to meet his
burden of proving this damage.  Indeed, although plaintiff
claims $1,150 per month as the home's rental value, other
exhibits provide opinions of the entire property's rental value
ranging from $2,000 [Pl. Ex. 1], to $5,000 [Pl. Ex. 6] per
month. Accordingly, the Court cannot, within reason, determine
the proper rental value for the main home.  See Leisure Resort,
277 Conn. at 35.  Moreover, the Court cannot equitably award
plaintiff use and occupancy payments where defendant essentially
acted as the main caretaker of the property for the benefit of
both parties.  Defendant testified at length as to the time,
effort, and money she contributed to the home's upkeep and

repair.  Given the figurative blood, sweat, and tears defendant poured into the property, while plaintiff conveniently ignored the property during this time, it would be inequitable to award plaintiff use and occupancy payments. Additionally, it bears noting that plaintiff failed to raise the issue of rent with defendant until the summer of 2005.[13]

20.  Plaintiff also seeks credit for uncollected rent from the main home from 2007 to 2010.  As previously stated, plaintiff has failed to meet his burden proving this damage, as he has failed to present competent evidence of the fair rental value of the home.  Moreover, plaintiff could have made efforts to rent the home, yet failed to do so.  As such, the Court declines to award plaintiff credit for this item.

21.  Plaintiff finally contends that defendant's account should be reduced by $110,617.29, the amount of the 2004 mortgage payoff drawn from the property's sale proceeds.

---

[13] Plaintiff points to the case of Lerman v. Levine, 14 Conn. App. 402 (App. Ct. 1988) as "dispositive of the issues before the court." [Pl. Post Trial Summ., Doc. #66, at 1].  Lerman involves a partition and sale of residential property.  Although plaintiff claims this case is dispositive, he ignores that "the equities in partition actions are balanced by trial courts on a case-by-case basis. The fact that other trial courts may have ruled differently in the ultimate division of sale proceeds in a partition action does not require, in itself, a similar result in the present case.  'The determination of what equity requires is a matter for the discretion of the trial court.'"  DiCerto v. Jones, 108 Conn. App. 184, 188 n. 3 (App. Ct. 2008) (quoting Segal v. Segal, 86 Conn. App. 617, 630 (App. Ct. 2004)).  Similarly, the accounting statute invoked by plaintiff encompasses a complete array of equitable principles.  Accordingly, the division of sale proceeds in Lerman does not require a similar result here.

Plaintiff submits that this is an amount defendant "already got". [See Pl. Ex. 23]. The Court declines to award plaintiff this sum. As was well established through the testimony of the parties, and the documentary evidence, plaintiff consented to defendant obtaining the 1999 and 2004 loans, and encumbering the property. Indeed, there is no evidence contradicting plaintiff's consent. Moreover, the Court finds that defendant largely used the 1999 and 2004 loan proceeds to finance repairs to the home. Although there was a vague understanding between the parties that defendant would repay the 2004 loan, because the loan proceeds financed property repairs and expenses that benefitted both parties, the Court declines to award plaintiff credit for this item.[14]

22. In sum, the Court credits plaintiff's account in the total amount of $54,465.97, and deducts from defendant's account the same total.[15]

---

[14] The Court shall address the issue of defendant applying loan proceeds to a personal car loan in a subsequent section.

[15]

| Uncontested Expenses | | | $48,102.47 | | |
|---|---|---|---|---|---|
| Other Expenses | | | $3,617 | | |
| Foreclosure Attorney's Fees | | | $2,746.50 | | |
| **Total** | | | | $54,465.97 | | |

*Count Two – Unjust Enrichment*

23.   Plaintiff seeks damages for defendant's alleged unjust enrichment as a result of her residing in the home rent-free, and by applying $22,481.33 of the 2004 Loan proceeds to pay-off her personal car loan.  Defendant denies that she was unjustly enriched.

24.   "Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiff's detriment." Trenwick American Reinsurance Corp. v. W.R. Berkley Corp., 138 Conn. App. 741, 754 (App. Ct. 2012) (quoting Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-3 (1994)).

25.   "It is the plaintiff's burden to prove the elements of a claim of unjust enrichment, including that the defendant was benefitted." Trenwick, 138 Conn. App. at 754 (citing See New Hartford v. Conn. Resources Recovery Auth., 291 Conn. 433, 541-52 (2009)).

26.   It is undisputed that defendant used $22,481.33 of the 2004 loan proceeds to pay-off her personal car loan. [See Def. Ex. 556C]. However, the Court finds that plaintiff failed to prove that defendant unjustly did not pay plaintiff for that

benefit.  Indeed, the Court credits defendant's testimony that
it was her understanding that she would eventually acquire
plaintiff's interest in the home.  With that in mind, the Court
further credits defendant's testimony that she would not have
applied the loan proceeds to her car loan, had defendant
believed she would not acquire the entire property.  Moreover,
the parties testified that plaintiff encouraged defendant to use
the 2004 loan proceeds to pay for her car loan.  Plaintiff may
not claim unjust enrichment on this basis.[16]

27.  With respect to the issue of defendant failing to pay rent
for her use and occupancy of the home, the defendant benefitted
by living in the home from 2000 through the end of 2006 without
paying rent.  However, plaintiff failed to prove that defendant
unjustly did not pay plaintiff for her use and occupancy of the
home.  As defendant testified at length, and as corroborated by
Ms. Arnold's testimony, for well over seven years defendant
personally worked to maintain and repair the home, for both of
the parties' benefit.  Not only did defendant expend copious
amounts of hands-on labor, but she also paid for all household
expenses for the time that she occupied the property.  Simply,
it would be inequitable to find defendant was unjustly enriched

---

[16] Nevertheless, and as will be discussed in addressing defendant's
counterclaim for accounting and distribution, the Court will reduce
defendant's account by $22,481.33, i.e., the benefit she personally
received from the 2004 loan proceeds.

by living in the home rent free, when she invested a great deal of time and money in the property.  See Binder v. Windmill Mgmt., LLC, No. FSTX08CV106004435S, 2013 WL 593936, at *12 (Conn. Super. Ct. Jan 17, 2013) (quoting Fitzpatrick v. Scalzi, 72 Conn. App. 779, 786 (App. Ct. 2002)) ("With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed to, to examine the circumstances and the conduct of the parties[...]").

28.  Accordingly, the Court finds for defendant on count two of the Amended Complaint.

### Count Three – Breach of Fiduciary Responsibility

29.  Plaintiff seeks damages for defendant's alleged breach of her fiduciary duties as a result of defendant alleged failure to maintain the property, rent the upstairs apartment, and to provide plaintiff with half of the collected rental proceeds.

30.  To establish a breach of fiduciary duty, the plaintiff must prove by a preponderance of the evidence:

> (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2) That the defendant advanced his or her own interests to the detriment of the plaintiff; (3) That the plaintiff sustained damages; (4) That the damages were proximately

-27-

caused by the fiduciary's breach of his or her fiduciary
duty.

Stedman v. Stedman, No. HHDCV106008073S, 2012 WL 6122487, at *3
(Ct. Super. Ct. Nov. 14, 2012) (citation omitted).

31.  Notwithstanding the above, Connecticut law broadly
defines a fiduciary relationship as a relationship that is
"characterized by a unique degree of trust and confidence
between the parties, one of whom has superior knowledge, skill
or expertise and is under a duty to represent the interests of
the other. . . the superior position of the fiduciary or
dominant party affords him great opportunity for abuse of the
confidence reposed in him." Dunham v. Dunham, 204 Conn. 303, 322
(1987) (internal citations omitted), overruled in part by
Santopietro v. New Haven, 239 Conn. 207, 213 n. 8 (1996).

32.  "In the seminal cases in which [the Connecticut
Supreme Court] recognized the existence of a fiduciary
relationship, the fiduciary was either in a dominant position,
thereby creating a relationship of dependency, or was under a
specific duty to act for the benefit of another." Hi-Ho Tower,
Inc. v. Com-Tronics, Inc., 255 Conn. 20, 38 (2000).  Conversely,
where no such relationship was found, "the parties were either
dealing at arms length, thereby lacking a relationship of
dominance and dependence, or the parties were not engaged in a
relationship of special trust and confidence." Id. at 39.

-28-

33.   With that being said, at least one Connecticut court
has recognized that, "A fiduciary relationship, strictly
speaking, does not exist between tenants in common by reason of
the mere fact that they are such." Beebee v. Beebee, No.
103684,  1995 WL 617392, at *11 (Conn. Super. Ct. Oct. 12, 1995)
(citing 86 C.J.S., Tenancy in Common, Section 17, p. 377).

34.   As an initial matter, based on the testimony of the
parties, the Court finds that the parties were in a fiduciary
relationship.  Because defendant lived in the home while
plaintiff resided out of state, and where defendant essentially
controlled the property, the Court finds that defendant was in a
dominant position as compared to that of the plaintiff until the
time she vacated the home.  See Binder, 2013 WL 593936, at *10
("The law will imply fiduciary responsibilities only where one
party has a high degree of control over the property or subject
matter of another and the unsuspecting party has placed its
trust and confidence in the other.") (quoting Hi-Ho Tower, 255
Conn. at 41).

35.   "Once a fiduciary relationship is found to exist, the
burden of proving fair dealing properly shifts to the
fiduciary." Binder, 2013 WL 593936, at *10 (citing Konover Dev.
Corp. v. Zeller, 228 Conn. 206 (1994)).

36.   Plaintiff first claims that defendant breached her
fiduciary duties by failing to maintain the property.  The Court

-29-

finds plaintiff's claim without merit.  The defendant testified at length as to her efforts to maintain, repair, and rehabilitate the home.  Moreover, the testimony of Ms. Arnold, her long-time friend and neighbor, further corroborates defendant's testimony concerning her efforts.  Additionally, the Court finds that defendant did not place her own self-interest before plaintiff's.  In fact, she contributed countless hours of labor to the maintenance of the home, which undoubtedly benefitted both parties.  This is further bolstered by defendant's documentary evidence, reflecting hundreds of invoices and checks for home repairs.  Additionally, even when plaintiff vacated the home, rather than leaving the home vacant and exposed to the perils of a New England winter, defendant paid to have the home winterized.  The Court further credits defendant's testimony that she did not cause the damage to the home shown in plaintiff's exhibit 2, and that much of the damage was present in 2000.  The Court credits her testimony over plaintiff's because she lived in the home at this time, and was a constant presence until 2007.  Plaintiff, on the other hand, did not once visit the property from the time of the parties' mother's funeral, until at least April 2008.  As such, the Court finds plaintiff has met her burden of proving fair dealing with respect to maintenance of the home.

37.  Plaintiff next claims defendant breached her fiduciary responsibilities for her failure to rent the apartment.  The Court also finds this claim without merit.  The defendant testified that she attempted to rent the apartment "for a long time" and that no one would rent it.  Although defendant testified that she had to be at the home to regulate the heat for a tenant, the Court does not find that this influenced defendant with respect to renting the apartment.  Indeed, given that any rental income would have benefitted her and defendant, the Court finds that defendant acted in good faith and in the best interests of both parties by at least attempting to rent the apartment.  Moreover, even if defendant had not acted in good faith, plaintiff has failed to sustain his burden of proving his damages where there is no competent evidence of the apartment's rental value for the time in question.

38.  Finally, plaintiff claims defendant breached her fiduciary duties by failing to remit to plaintiff one half of the rental proceeds collected from the apartment.  Although defendant admittedly failed to remit plaintiff's portion of the rental proceeds, the Court credits plaintiff's testimony that these proceeds were used to pay delinquent property taxes. Because this sum was used for the benefit of the property, and ultimately in the parties' best interests, the Court again finds plaintiff's claim without merit.

39.  Accordingly, for the foregoing reasons, the Court finds for defendant on count three of the Amended Complaint.

## C. Defendant's Counterclaims
### *Count I — Action for Accounting and Distribution*

40.  Defendant likewise seeks an accounting pursuant to Conn. Gen. Stat. §52-404(b) and distribution of the property's sale proceeds.  The Court need not repeat the guiding principles of law, which are recited above.

41.  Defendant seeks credit for the payments made on the 1999 and 2004 mortgages.  Plaintiff argues that the Court should not award plaintiff credit for both her mortgage payments and property related expenses, where the defendant financed much of the property related expenses with the loan proceeds.  Plaintiff contends that crediting defendant with both mortgage payments and property related expenses is an unfair "double counting".  The Court declines to award defendant credit for her mortgage payments on the equitable grounds that she was residing in the home rent-free during the period in question, and that there was some understanding that she would repay this loan.  Indeed, because the Court declined to provide credit to plaintiff for use and occupancy payments, it would be inequitable to now award defendant credit for her mortgage payments.

42.  Defendant next seeks credit for real property taxes she paid from 2000 to 2007, totaling $25,591.48.  In plaintiff's

-32-

proposed findings of fact, he concedes defendant is entitled to credit for payment of real property taxes. [See Pl. Prop. Findings of Fact and Conclusions of Law, Doc. #53, at 38]. Accordingly, defendant is entitled to credit for half of the real property tax payments in the amount of $12,795.74. Likewise, plaintiff's account must be reduced by the same amount.

43.   Defendant also seeks credit for home insurance payments she incurred from 2000 to 2007 totaling $9,961. Plaintiff concedes that defendant is entitled to credit for payment of home insurance payments.  [See id.].  Accordingly, defendant is entitled to credit for half of the home insurance payments in the amount of $4,980.50.  Likewise, plaintiff's account must be reduced by the same amount.

44.   Defendant seeks credit for monies spent to repair and improve the home from 2000 through 2010.  The Court declines to award credit for duplicated expenses, expenses incurred prior to February 1999, expenses that do not bear a date, and expenses that are not otherwise properly supported by either the defendant's credible testimony or legible documentary evidence. The Court credits defendant's testimony that the invoices and checks presented in evidence reflect expenses incurred, and paid, in connection with the property.  Bearing this in mind, the Court finds that defendant is entitled to the following

-33-

credits for amounts paid in connection with the property, and
plaintiff the following reductions:

| Year | | Credit to Defendant | | | Reduction to Plaintiff | | |
|------|--|---------------------|--|--|------------------------|--|--|
| 1999 | | $27,755.67 | | | ($27,755.67) | | |
| 2000 | | $5,247.31 | | | ($5,247.31) | | |
| 2001 | | $2,477.20 | | | ($2,477.20) | | |
| 2002 | | $1,791.32 | | | ($1,791.32) | | |
| 2003 | | $5,654.57 | | | ($5,654.57) | | |
| 2004 | | $2,147.62 | | | ($2,147.62) | | |
| 2005 | | $2,006.95 | | | ($2,006.95) | | |
| 2006 | | $794.87 | | | ($794.87) | | |
| 2007-08 | | $4,676.74 | | | ($4,676.74) | | |
| **TOTAL:** | | $52,552.25 | | | ($52,552.25) | | |

45.   Defendant next seeks credit for her attorneys' fees
allegedly incurred to hire an attorney for partition of the
property.  [See Def. Exs. 501, 504, 547B-C,E,G-I; Def. Post-
Evid. Trial Mem., Doc. #65, at Sched. 3]. Defendant claims such
action was necessary to compel plaintiff to sell the property,
and to assist her with the property expenses.  However, like
plaintiff, defendant has failed to point to any contractual
provision or statutory exception that would here permit the
award of attorneys' fees.  See Mellon, 286 Conn. at 695.
Accordingly, the Court declines to credit defendant for these
items.

46.   Defendant also seeks credit for time spent painting
and wallpapering the interior of the home.  Defendant claims
$7,000 for her labor.  Although the Court credits defendant's
testimony that she provided these services, it declines to award

her $7,000 for her time spent.  Given that plaintiff lived in
the home rent-free, and the Court declined to award plaintiff
use and occupancy payments, it would be inequitable to now
compensate defendant for time spent working to improve the home.
Although defendant's work benefitted both parties by benefitting
the property, the Court concludes that any such time spent
painting and wallpapering the home should be figuratively "set-
off" against the time that she lived in the home free of charge.
Accordingly, the Court declines to credit the defendant for this
item.

47.  Defendant admitted at trial that she applied
$22,481.33 of the 2004 loan proceeds to satisfy a personal car
loan.  Plaintiff did not receive any benefit from this portion
of the loan proceeds.  Accordingly, the Court finds defendant's
account should be reduced by $22,481.33, and plaintiff's
credited in this same total.

48.  In sum, the Court credits defendant's account in the
total amount of $70,328.49, and deducts from plaintiff's account
the same total.[17]  The Court shall additionally deduct $22,481.33
from defendant's account for repayment of her car loan from the

---

| | |
|---|---|
| Real Property Taxes | $12,795.74 |
| Home Insurance Payments | $4,980.50 |
| Property Expenses | $52,552.25 |
| [17] **Total** | $70,328.49 |

2004 Loan proceeds, and credit plaintiff's account in this same amount.

### Count II – Unjust Enrichment

49.   Defendant alleges plaintiff will be unjustly enriched if he is "reimbursed for money he allegedly spent on the Bethel property in 2009 and 2010 without giving full credit for the years of monetary contributions [defendant] spent on the property[. . .]" [Def. Second Counterclaim, Doc. #10].

50.   The defendant's unjust enrichment claim is without merit.   Indeed, defendant's claim appears entirely contingent on the Court's ruling in this action.   Defendant failed to present any evidence that plaintiff benefitted, that plaintiff unjustly did not pay defendant for the benefits, and that the failure of payment was to the defendant's detriment.   Accordingly, the Court finds for plaintiff on count two of the counterclaim.

## III. <u>Order of Distribution</u>

Based on the foregoing findings of fact and conclusions of law, the Court orders that the $206,287.84 held in escrow, be distributed to the parties as follows:

| Item | Plaintiff | Defendant |
|---|---|---|
| Escrow Balance | $103,143.92 | $103,143.92 |
| Plaintiff's Expenses | $54,465.97 | ($54,465.97) |
| Defendant's Expenses | ($70,328.49) | $70,328.49 |
| Defendant's Car Payment | $22,481.33 | ($22,481.33) |
| **TOTAL TO BE DISTRIBUTED** | **$109,762.73** | **$96,525.11** |

## IV.  <u>Conclusion</u>

For the reasons stated, judgment shall enter in favor of defendant on counts two and three of the Amended Complaint for unjust enrichment and breach of fiduciary duties, respectively. Judgment shall also enter in favor of plaintiff on count two of the Counterclaim for unjust enrichment.

As set forth in Section III of this ruling, after carefully reviewing the evidence and balancing the equities, the Court orders that $109,762.73 of the escrow proceeds be distributed to plaintiff, Floyd Culhane and $96,525.11 to defendant, Janice Culhane.

This is not a Recommended Ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #40] on October 12, 2012 with appeal to the Court of Appeals.  Fed. R. Civ. P. 73(b)-(c).

ENTERED at Bridgeport this 27th day of August 2013.


/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE